JS 44 (Rev. 07/16)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
OCWEN LOAN SERVICING, LLC, HOMEWARD RESIDENTIAL INC.

**DEFENDANTS**
RADIAN GUARANTY INC.

**(b)** County of Residence of First Listed Plaintiff   Palm Beach County, FL
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Philadelphia, PA
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Matthew D. RossoWhitney D. Ross, Reed Smith LLP, 1717 Arch Street, Philadelphia PA (215) 241-1220; David M. Halbreich, Reed Smith LLP, 355 S. Grand Ave. Los Angeles, CA (213) 457-8000;David E. Weiss, Reed Smith LLP, 101 Second Street, San Francisco, CA (415) 543-8700

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1   U.S. Government Plaintiff | ☐ 3   Federal Question *(U.S. Government Not a Party)* |
| ☐ 2   U.S. Government Defendant | ☒ 4   Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 460 Deportation |
| | | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| | | | | | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. sec. 1332 - Diversity
Brief description of cause:
Breach of Contract

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ Excess of $150,000

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions)*

JUDGE       DOCKET NUMBER

DATE
12/22/2016

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #     AMOUNT     APPLYING IFP     JUDGE     MAG. JUDGE

## UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff:  1661 Worthington Road, West Palm Beach, FL 33409

Address of Defendant:  1601 Market Street, Philadelphia, PA 19103

Place of Accident, Incident or Transaction:  Eastern District Pennsylvania
                                    *(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))    Yes ☑  No ☐

Does this case involve multidistrict litigation possibilities?    Yes ☐  No ☑
*RELATED CASE, IF ANY:*
Case Number: _____  Judge _____  Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
   Yes ☐  No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
   Yes ☐  No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
   Yes ☐  No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
   Yes ☐  No ☑

CIVIL: (Place ✓ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☑ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
   (Please specify) _____

### ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I,  Whitney D. Ross  , counsel of record do hereby certify:

☒ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs.
☐ Relief other than monetary damages is sought.

DATE: 12/22/2016 _____    206956
                    Attorney-at-Law               Attorney I.D.#

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 12/22/2016 _____    206956
                    Attorney-at-Law               Attorney I.D.#

CIV. 609 (5/2012)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| OCWEN LOAN SERVICING, LLC and | : | CIVIL ACTION |
| HOMEWARD RESIDENTIAL, INC. | : | |
| v. | : | |
| | : | NO. |
| RADIAN GUARANTY INC. | : | |
| | : | |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.        ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
     and Human Services denying plaintiff Social Security Benefits.        ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.        ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
     exposure to asbestos.        ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
     commonly referred to as complex and that need special or intense management by
     the court. (See reverse side of this form for a detailed explanation of special
     management cases.)        ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.        (x)


| | | |
|---|---|---|
| December 22, 2016 | Whitney D. Ross | |
| **Date** | **Attorney-at-law** | **Attorney for Plaintiffs** |
| (215) 851-8100 | (215) 851-1420 | wross@reedsmith.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| OCWEN LOAN SERVICING, LLC and HOMEWARD RESIDENTIAL, INC., on their own behalf and on behalf of residential mortgage loan owners and trustees,<br><br>                    Plaintiffs,<br><br>       v.<br><br>RADIAN GUARANTY INC.,<br><br>                    Defendant. | Case No.:<br><br><br>**COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Ocwen Loan Servicing, LLC ("Ocwen Servicing") and Homeward Residential Inc. ("Homeward") (collectively, "Ocwen"), on their own behalf and on behalf of residential mortgage loan owners and trustees, by their undersigned counsel, file this Complaint ("Complaint") against Defendant Radian Guaranty Inc. ("Radian"), and in support thereof, allege as follows:

## NATURE OF THE ACTION

1.      Ocwen brings this civil action to hold Radian accountable for its unfair and deceptive conduct towards its policyholders, during and after the economic downturn, on thousands of claims involving hundreds of millions of dollars of loss.   Ocwen asserts claims for breach of contract and seeks declaratory relief and equitable indemnification arising out of Radian's repeated breaches of its contractual obligations to pay losses due to defaults on loans by borrowers under the terms of first-lien mortgage insurance policies issued by Radian.  Ocwen also asserts a claim for bad faith based on Radian's wrongful and unreasonable refusal to pay claims that Radian recognizes as valid by denying and/or rescinding coverage, as well as Radian's wrongful and unreasonable refusal to pay the full amount due on claims submitted for

payment even in those situations where Radian has determined that coverage exists for a particular claim.

2.      For reasons not permitted under its insurance policies, Radian has denied hundreds of millions of dollars in valid mortgage insurance claims on loans serviced by Ocwen. In or around mid-2007, Radian started embarking on a strategy to:  (1) rescind coverage or deny claims in full; or (2) where that could not be accomplished, pay less than the full amount owed under its insurance policies due to alleged servicing defects related primarily to default servicing and the completion of foreclosure proceedings (hereinafter, to "curtail" or a "curtailment").

3.      Before the financial crisis, Radian reaped hundreds of millions of dollars through its participation in the home mortgage market, selling mortgage insurance policies to ensure that the borrowers of certain residential mortgage loans made payment of principal and interest, and in the event of borrower default, to pay claims with respect to those defaulted loans.  Radian's bad faith refusal to pay now is part of its ongoing strategy since the collapse of the housing market to attempt to clear its books of losses so as to create the illusion of a more favorable business outlook for regulators and investors.

4.      As a result of such actions, Ocwen, on its own behalf and on behalf of residential mortgage loan owners and trustees, is seeking:  (1) a declaratory judgment declaring that Radian's practices with respect to its denials, rescissions, and/or curtailments of claims are improper; (2) actual money damages as a result of Radian's breach of contract; (3) punitive damages, attorneys' fees and costs, interest, and all damages and other available relief recoverable by law as a result of Radian's bad faith conduct; and (4) equitable indemnification for sums Ocwen was forced to pay to third parties resulting from Radian's wrongful rescissions, denials and/or curtailments.

## THE PARTIES

5.      Ocwen Servicing is a limited liability company incorporated under the laws of the State of Delaware, and maintains its principal place of business in Florida.  Ocwen Servicing services first-lien mortgage loans, including loans insured by Radian that are the subject of this action.  As described in more detail below, Ocwen Servicing is the servicer under certain of the mortgage insurance policies at issue in this action, and thus is authorized to bring this action as a representative of the Insured, as the Insured, or alternatively, as an assignee.

6.      As a limited liability company, Ocwen Servicing's sole member is Ocwen Mortgage Servicing, Inc., a corporation incorporated in the U.S. Virgin Islands, with a principal place of business in the U.S. Virgin Islands.  100% of the common stock of Ocwen Mortgage Servicing, Inc. is owned by Ocwen Financial Corporation.  Ocwen Financial Corporation is a publicly traded corporation, with no entity owning more than 10% of its stock, and is incorporated in the State of Florida with its principal place of business in Atlanta, Georgia.

7.      Homeward is a corporation incorporated under the laws of the State of Delaware, and maintains its principal place of business in Addison, Texas.  Homeward services first-lien mortgage loans, including loans insured by Radian that are the subject of this action.  As described in more detail below, Homeward is the servicer under certain of the other mortgage insurance policies at issue in this action, and thus is authorized to bring this action as a representative of the Insured, as the Insured, or alternatively, as an assignee.  Homeward and Ocwen Servicing share the same parent company, Ocwen Financial Corporation.

8.      Radian is a corporation incorporated under the laws of the Commonwealth of Pennsylvania, and maintains its principal place of business in Philadelphia, Pennsylvania.  Radian is in the business of selling mortgage insurance for residential home mortgage loans, and is a sophisticated market actor in this area.  Radian issued the mortgage insurance policies at

- 3 -

issue in this action.

## JURISDICTION AND VENUE

9.      The subject matter jurisdiction of this Court is based upon 28 U.S.C. § 1332, in that there is complete diversity of citizenship among the Parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a), as Radian resides in this District.

## MORTGAGE INSURANCE POLICIES

11.     Radian sold "flow" mortgage insurance policies to insure certain first-lien mortgage loans against the risk of borrower default (the "Flow Policies"). Flow Policies cover individual loans originated and submitted for coverage on a loan-by-loan basis. The loans covered under the Flow Policies are not submitted as part of any pooling arrangement or securitization. They are submitted for coverage on an individual basis, and coverage for an individual loan is evidenced by a certificate of insurance issued by Radian. Loans covered under Radian's Flow Policies continue to be insured by Radian even if they are sold by the originator to a third-party investor, such as another lender or one of the government-sponsored enterprises ("GSEs"), Fannie Mae or Freddie Mac. The Flow Policies sold by Radian at issue in this action are subject to the terms and conditions set forth in Radian's Master Policy No. RAF1040 4/06, which is attached hereto as Exhibit A.

12.     Ocwen also services mortgage loans that are part of residential mortgage-backed securitizations and insured by Radian under separate pool policies (the "Pool Policies"). Exhibit B attached hereto is an example of one of the Pool Policies at issue in this action. Pool Policies insure a group, or pool, of individual mortgages. Mortgage insurers, like Radian, generally issue pool policies in connection with mortgage securitizations. The "securitization" of loans is not

unique to the residential lending industry.  In a securitization, a lender creates a "pool" of individual mortgage loans, grouping them together based on their individual characteristics.  The "pool" of loans is sold to a special purpose trust.  These loans are then used as collateral for certificates or notes that are sold to private investors.

13.     Radian has received and continues to receive all required premiums under the Flow Policies and Pool Policies (collectively, the "Policies").

14.     Ocwen has performed all material conditions, covenants, and promises required to be performed in accordance with the terms and conditions of the Policies, and is or has been at all times, ready, willing and able to perform any and all conditions required to be performed in accordance with the terms and conditions of the Policies.

## OCWEN'S ROLE AS SERVICER

15.     The servicing rights for each of the subject loans were sold, assigned or transferred to Ocwen.  Thus, Ocwen is the mortgage servicer for each subject loan insured under the Policies.

16.     As the servicer, Ocwen's duties typically include:  acceptance and recording of mortgage payments; calculating variable interest rates on adjustable rate loans; payment of taxes and insurance from borrower escrow accounts; negotiation of workouts and modifications of mortgages upon default; conducting or supervising the foreclosure process when necessary; collecting the mortgage insurance proceeds if and when a claim is submitted; distributing the mortgage insurance proceeds to the proper beneficiaries; and litigating claims for coverage if and when the mortgage insurer improperly denies, rescinds or curtails coverage.

17.     Ocwen, on its own behalf, is seeking damages Ocwen itself has suffered as a result of Radian's improper denials, rescissions, and curtailments under the Policies.  Ocwen relies on Radian's agreement to pay covered claims fully when Ocwen services loans for

investors.  When Radian does not perform under the Policies as promised, the investors that own

the denied, rescinded and curtailed loans sometimes demand that Ocwen repurchase the loans or

make the investors whole for the claims that Radian denies, rescinds, or curtails.  Such demands

cause considerable harm directly to Ocwen.  In the case of a repurchase obligation, for example,

Ocwen often is required to pay the remaining principal balance of the loan, which typically

exceeds the insurance proceeds that Radian has refused to pay.  Also, Ocwen has had to expend

substantial sums of money in responding to Radian's wrongful denials, rescissions, and

curtailments.

18.     In addition, under the express terms of the Policies and other documents

(described below) purporting to establish the servicer's rights and obligations thereunder,

Ocwen, as Servicer, is authorized to bring this action as the Insured, as a representative of the

Insured, or alternatively, as an assignee.

### A.     THE SERVICER'S RIGHTS UNDER THE POLICIES

19.     The Flow Policies' definition of "Servicer" states that "The Servicer is deemed to

be the representative of the Insured for purposes of the Policy."  The Flow Policies do not place

any limitations on the Servicer to act in its role as a representative of the Insured.  Where, as

under the Policies at issue here, an owner or investor, purchases a mortgage loan that is insured

by a mortgage insurance policy that explicitly identifies the Servicer as a representative of the

"Insured," it agrees that the Servicer may act on its behalf in submitting claims to the mortgage

insurer and in pursuing mortgage insurance proceeds in the event that the mortgage insurer

denies, rescinds, or curtails coverage.  Therefore, under the express terms of Radian's Flow

Policies, Ocwen, as the Servicer of the subject loans, is the representative of the Insured and has

the authority like any insured to bring this litigation against Radian for its failure to pay in full

valid claims submitted under the Flow Policies.  The Flow Policies make clear that both the

owners of the subject loans and Radian agreed that Ocwen, as Servicer, can bring this action on behalf of the owners.

20.     The Pool Policies identify the trustees of the trusts as an Insured on the face of the policy, and the Pool Policies' definition of "Insured" states that "the Insured may contract with any other Person to perform the Insured's obligations under this Policy."

21.     The Pool Policies further define "Transaction Agreements" as those "agreements related to the Security . . . ." One of the Transaction Agreements for which this definition refers is the Pooling and Servicing Agreement ("PSA") – which was entered into between the trustees and Master Servicer, among other parties – and explicitly authorizes Ocwen (as Master Servicer under the PSA) to take all actions under the Pool Policies, including bringing this lawsuit against Radian:

> The Master Servicer shall, on behalf of the Trustee, prepare and file on a timely basis with the Pool Insurer . . . all claims which may be made under the Pool Policy with respect to the Covered Mortgage Loans. Consistent with all rights and obligations hereunder, the Master Servicer shall take all actions required under the Pool Policy as a condition to the payment of any such claim. Notwithstanding anything to the contrary under the Pool Policy, the Master Servicer (and not the Trustee) will be responsible for all the obligations of the Trust and will take all actions required of the Trust under the Pool Policy.

*See, e.g.*, Option One Mortgage Loan Trust 2006-2 PSA § 3.30.

22.     Therefore, Ocwen as "Servicer" is the "Insured" under the express terms of Radian's Pool Policies, or at a minimum an assignee under the Pool Policies, and thus is authorized and entitled on its own behalf and on behalf of the trustees to "take all actions required of the Trust under the Pool Policy," including bringing this action for breach of the Policies and to collect all insurance proceeds due thereunder. The Pool Policies make clear that the trustees and Radian agreed that Ocwen, as Servicer, is authorized to bring this action on behalf of the trustees.

### B.   THE SERVICER'S RIGHTS UNDER THE GSE SERVICING GUIDES

23.     Certain of the loans insured under the Flow Policies are owned by the GSEs.  As the servicer for certain GSE loans, the GSEs maintain that Ocwen is required to comply with the GSE servicing guides, which set forth certain policies and procedures that servicers are expected to follow, including policies and procedures relating to mortgage insurance.

24.     Under Fannie Mae's servicing guide, for example, the servicer:

> must file all primary MI claims for liquidated conventional first lien mortgage loans
>
> - insured under a master primary policy issued by any approved mortgage insurer . . ., and
>
> - for which Fannie Mae bears the risk of loss.

See Fannie Mae Servicing Guide E-4.5-01:  Filing MI Claims for Conventional Mortgage Loans or for Other Mortgage Loans for which Fannie Mae Bears the Risk of Loss (05/11/2016).

25.     After it files the claim, Fannie Mae requires that the servicer follow up with the mortgage insurer to ensure that the claim is settled in a timely manner:

> If Fannie Mae does not receive the MI claim proceeds before the end of the contractual period, it will ask the servicer to explain the delay.  The following table provides a list of data points the servicer must include in its explanation to Fannie Mae.

| √ | The servicer must include . . . |
|---|---|
| | The date it met the mortgage insurer's documentation requirements (if they had not been met with the servicer filed the claim) |
| | The dates of its follow-up efforts with the mortgage insurer. |
| | The mortgage insurer's response(s) to the servicer's inquiries. |

See Fannie Mae Servicing Guide F-1-07:  Filing an MI Claim for a Liquidated Mortgage Loan or Acquired Property (08/17/2016).

26.     Fannie Mae's servicing guide further provides that servicers must "[e]nsure the MI coverage Fannie Mae requires when it purchases or securitizes a mortgage loan remains in effect for as long as required by Fannie Mae."  See Fannie Mae Servicing Guide B-8.1-01:

- 8 -

Conventional Mortgage Insurance Servicers Responsibilities (11/12/2014): Conventional

Mortgage Insurance Servicer Responsibilities (11/12/2014). For that reason, Fannie Mae

requires that servicers reimburse Fannie Mae:

- if certain costs in the claim are disallowed;

- if the amount of interest payable is cut off solely because the servicer did not follow the required procedures for conveyance or claim filing; or

- if any payments the servicer owes the insurer or guarantor (for premiums, surcharges, etc.) are netted against the benefits paid to Fannie Mae.

*Id.* at E-4.5-01 (05/11/2016).

27.     Similarly, the Freddie Mac servicing guide requires that mortgage insurance

remain in full force and effect for the life of the loan and if the mortgage insurance is denied,

rescinded or in any way curtailed, Freddie Mac will seek indemnification from the servicer. *See*

Freddie Mac Servicing Guide Chapter 8203.1: Mortgage insurance warranties (03/02/16); *id.* at

Chapter 3602: Repurchases.

28.     Therefore, the GSE servicing guides authorize Ocwen to bring this action on

behalf of the GSEs or, alternatively, make Ocwen the real party in interest with respect to the

amounts that Radian has denied, rescinded or curtailed because such guides make clear that the

GSEs will look to Ocwen to reimburse such amounts.

### C.     THE SERVICER'S RIGHTS UNDER RADIAN'S OWN GUIDES

29.     To "help loan servicers [like Ocwen] meet Radian's requirements for servicing

delinquent or defaulted loans with Radian mortgage insurance coverage," Radian issued a

Default and Claims Servicing Guide ("Guide") to provide additional details regarding the various

rights and responsibilities under Radian's Policies. Default and Claims Servicing Guide

("Guide") at 5 (Effective Aug. 2014). According to Radian, this Guide, as well as the Policies

themselves, and any applicable endorsements, "identify the specific terms and limiting

conditions under which Radian mortgage insurance is issued." *Id.* Notwithstanding the foregoing, and as discussed in more detail below, Ocwen disputes that Radian can impose obligations through this Guide that are not included in the Policies. Nevertheless, that Radian created such a document, and its admissions within, demonstrate that Radian acknowledges the Servicer is authorized to take all actions under the Policies on its own behalf and on behalf of the owners and/or trustees, including bringing this action against Radian.

30.    In its Guide, Radian specifies that all servicers "adhere to the highest performance standards when servicing Radian insured loans." Guide at 36. Servicers, for example, are to:

- "[E]stablish a system, compliant both with their own internal requirements and applicable GSE requirements, for successfully servicing delinquent mortgage loans," *id.* at 7;

- "[R]eport specific delinquent loan information [to Radian] in order to predict future claim filings," *id.* at 10;

- "[E]xhaust all retention workout options before pursuing a liquidation workout," *id.* at 12;

- Submit Claims for mortgage insurance coverage in the event of a default and loss, *id.* at 24-30;

- Provide Radian with any documents Radian contends are "necessary to perfect the Claim," *id.* at 24; and

- "[D]ocument the actions taken to resolve a default situation or minimize the loss incurred as a result of default, ensuring servicer activities were reasonable and consistent with industry standards for default servicing and in compliance with Radian's Master Policy, *id.* at 28.

31.    Radian's Guide further provides that if the Servicer fails to service a loan insured by Radian in a reasonable and prudent manner and consistent with the Highest Standards of Servicing as required by its Policies, then Radian claims it may deny or curtail the Claim. *Id.* at 31-33. In other words, Radian believes it is entitled to deny coverage or issue a curtailment based solely on the Servicer's conduct.

32.     Furthermore, regardless of the basis for any Radian denial, rescission or curtailment, Radian acknowledges that the Servicer alone is the proper party to engage in any dispute process to resolve Radian denials, rescissions and curtailments. *Id.* at 38-40.

33.     By the express terms of Radian's Policies, the Transaction Agreements, the GSE servicing guides and Radian's own Guide, Ocwen is authorized to bring this action as a representative of the Insured, as the Insured, or alternatively, as an assignee.

## FACTUAL BACKGROUND

34.     Over the last decade, there was such great competition in the mortgage insurance market that Radian, along with other mortgage insurers, engaged in a marketing campaign to convince lenders to purchase its mortgage insurance products and services rather than those of its competitors.

35.     Mortgage insurance was marketed as the means to protect lenders and servicers from the volatility of the mortgage market.  The now defunct Mortgage Insurance Companies of America ("MICA"), of which Radian was at one time a member, has explained that "[r]ecent trends in industry profitability provide a graphic picture of the cyclical risks of mortgage lending. It is against this pattern of peaks and valleys that mortgage insurance was designed to protect lenders." MICA 2001-2002 Fact Book & Membership Directory at 19.  As further recognized by MICA, "[m]ortgage insurers cannot raise premiums or cancel policies if risk increases over time." MICA 2008-2009 Fact Book & Membership Directory at 16.

### A.     THE EXPANSION OF RISKS INSURED BY RADIAN

36.     In the mid-2000s, when the real estate market was prosperous, Radian agreed to insure a large number of loans where lenders' underwriting guidelines did not require the lender to obtain documentation to verify the borrower's income.  These loans are often referred to as "stated income" loans, as the borrower stated his or her income on the loan application, but the

income was not required to be verified by the underwriter.  Rather, the guidelines required that other credit attributes be met before the underwriter approved the loan.

37.    Stated income loans were common in the mortgage industry, and Radian knew and understood that such loans did not require the verification of borrower income.  Radian recognized the increased risk associated with stated income loans and charged a higher premium to account for the increased risk.  As Radian stated in its 2006 Form 10-K:  "Because of the reduced documentation, we consider Alt-A business [including "stated income" loans] to be more risky than prime business, particularly Alt-A loans to borrowers with FICO scores below 660.  We insure Alt-A loans with FICO scores ranging from 620-660, but we have measures in place to limit this exposure, and we charge a significantly higher premium for the increased default risk associated with these loans."  Radian Group Inc., Annual Report (Form 10-K) at 10 (Mar. 1, 2007).

38.    As early as 2006, in its published guidelines for reduced documentation loans, Radian described itself as "an industry leader" in providing mortgage insurance for such loan programs.  Radian identified the following "two critical evaluations" to be expected in evaluating whether to approve a stated income loan:  "1.  Is the borrower's stated income reasonable for the line/type of work as disclosed/verified on the loan application?  and/or 2.  Is the borrower's income, stated or verified, supported by the amount of assets, stated or verified?"  Radian Alternative "A" Guidelines, effective Mar. 31, 2006 at 2.  Radian stated that in evaluating these questions, it expected lenders and its own underwriting staff "to utilize their overall underwriting expertise and knowledge in the evaluation of these products."  *Id.*

39.    Radian was not alone in its understanding of the increased risks associated with the changing marketplace.  As far back as 2004, various trade publications and even the mainstream press reported on lending practices and noted the evolution of underwriting

guidelines across the entire mortgage lending industry.  *See, e.g.*, Robert Stowe England,

Pushing the Edge on Alternative-A, Mortgage Banking, Feb. 2004, at 36.

### B.     THE "MORTGAGE CRISIS"

40.     In or around 2007, the once booming U.S. housing market collapsed.  Throughout

2007, real estate prices flattened and began to decrease nationally in the first sustained

nationwide home-price depreciation since the Great Depression, which led to substantial

increases in default and foreclosure rates.  Radian, as an active participant in the real estate and

mortgage markets, was well-aware of these market conditions.  Media outlets provided non-stop

coverage of the "mortgage crisis."  In an earnings conference call on July 25, 2007, Radian's

CEO explained:  "There is no denying that today's environment is more difficult than

anticipated, perhaps the most challenging environment we have seen in a long time . . . . The

rising interest rates and home price declines were the primary drivers of the increase in default

rates across the board with primary areas of deteriorating performance in California, Florida and

several Midwest states."  Final Tr. of Radian 2d Quarter 2007 Conference Call, July 25, 2007.

41.     As the U.S. economy spiraled into deep economic recession, home prices

plummeted and many homeowners found themselves in a position of negative equity wherein

they had mortgaged debt higher than the value of the property.  The collapse of the real estate

market was accompanied by a crash in the labor market, with employers downsizing, eliminating

millions of employees and reducing the salaries of remaining employees.  According to the

United States Department of Labor, the unemployment rate rose to over 10% in October 2009.

In an earnings call on May 5, 2009, Radian's CEO described the situation as "the worst

economic environment since the Great Depression."  Final Tr. of Radian 1st Quarter 2009

Conference Call, May 5, 2009.

42.     As a result of the deep economic recession, there was a dramatic increase in

defaults on residential mortgage loans.  From 2005 to 2008 alone, approximately 1.2 million

households were lost to the recession.

43.     On March 27, 2008, Radian announced that it was eliminating its "stated income"

and "stated asset" programs.  Press Release, *Radian Guaranty Inc. Eliminates 'Stated Income'*

*and 'Stated Asset' Programs*, (Mar. 27, 2008).  In a message to clients, Radian commented,

"while certain forms of alternative documentation used to verify assets and income are

appropriate with a disciplined underwriting process, the stated programs will no longer be

insurable as a result of poor performance." *Id.*  An article announcing these changes attributed

them to the change in market conditions and weaknesses in the housing market and the economy:

> These significant changes represent a variety of adjustments to loan-to-value, documentation and FICO requirements, and are part of an ongoing process at Radian to respond quickly to market conditions.
>
> These changes reflect the current market conditions and a commitment to our business partners and shareholders to write new business that will allow homebuyers appropriate and affordable alternatives," commented Dave Applegate, President of Radian Guaranty.  "The continued weakness in the housing market and overall economy has created unprecedented challenges for the industry and our clients. . . . Accordingly, we have tightened guidelines and increased pricing in areas in which we continue to see deterioration in our risk adjusted returns.

*Id.*  In other words, when the economy was strong, Radian was willing to relax its guidelines, but

when the economy weakened, Radian tightened its guidelines.

### C.     PROPER SUBMISSION OF CLAIMS FOR COVERAGE

44.     After the collapse of the real estate market, the number of claims submitted to

Radian for loans in default increased dramatically for all lenders.  The increase in defaults was

not limited to loans originated and/or serviced by Ocwen, but was a phenomenon that occurred

nationwide and impacted all mortgage lenders and servicers.  This risk of default is exactly the

type of risk Radian agreed to insure.

45.   Certain loans insured under the Policies have been and continue to be in default as that term is defined in the Policies.

46.   Ocwen timely filed a claim and proof of loss for each loan at issue in this litigation pursuant to the terms and conditions of the Policies.

47.   The claims and proofs of loss that were submitted for the loans insured under the Policies comply with the applicable terms and conditions of the Policies and/or applicable law or, at a minimum, substantially comply with the applicable terms and conditions of the Policies and/or applicable law.

48.   Pursuant to the terms and conditions of the Policies, Ocwen and/or the prior Servicer diligently pursued Appropriate Proceedings (as that term is defined in certain Radian Policies and below) and/or attempted to mitigate loss for each of the loans in default.

49.   The efforts of Ocwen and/or the prior Servicer in diligently pursuing foreclosure (and other such) proceedings and/or mitigating loss comply with the applicable terms and conditions of the Policies or, at a minimum, substantially comply with the applicable terms and conditions of the Policies, which is all that is required under the law.

### D.   RADIAN'S IMPROPER CLAIMS HANDLING

50.   Despite Ocwen's compliance or substantial compliance with the applicable terms and conditions of the Policies, Radian has attempted to escape its coverage obligations by taking unreasonable positions in its claims handling and/or engaging in improper post-loss underwriting in order to improperly deny, rescind or curtail valid claims that should have been paid in full.

51.   To date, Ocwen has identified in excess of 9,420 loans that Radian has improperly rescinded, denied and/or curtailed.  Attached hereto as Exhibit C is a list of the certificate numbers for all such loans.  With this information, Radian is able to identify, *inter alia*, the loans, the applicable standard policy form, the original lenders, the manner in which the loan was

submitted for insurance, the effective date of the certificate, the borrower name, the property address, the loan amount, the insured amount, the occupancy type, the appraised value, the loan-to-value ratio, and the premium amount.  Ocwen has no intention of pursuing coverage in these actions on loans listed in Exhibit C which were opted into and resolved by a settlement between Radian and any other lender, originator or servicer.

52.     Certain loans identified on Exhibit C are insured under Policies that require disputes under such Policies be decided in arbitration.  Accordingly, Ocwen simultaneously has filed a separate arbitration demand to pursue coverage with respect to those loans on Exhibit C that are required to be decided in arbitration.  Unless the parties subsequently decide otherwise, Ocwen intends for this litigation to decide only those loans on Exhibit C that are not required to be decided in arbitration.

53.     Ocwen may periodically identify additional disputed loans to Radian and this Court for incorporation into this litigation and, if necessary, will amend this Complaint from time to time if that is required to have those additional loans incorporated into this litigation and relate back to the original date of the filing of this Complaint.

### 1.     Radian's Improper Claim Denials

54.     Radian has asserted improper reasons when denying coverage without any factual or legal support, based on improper interpretations of the Policies, and inconsistent with the way it processed claims before the economy collapsed and the number of claims increased significantly.

55.     For example, Radian has wrongfully denied claims because it contends it did not receive all documentation it requested in order to evaluate coverage.  Radian makes this assertion even though the documents it purportedly needs were not required at origination under the applicable guidelines, are not reasonably required by Radian in order to reach a claim

determination, and/or the information contained in the allegedly missing documents can be obtained from other sources upon a good faith investigation by Radian.

56.     By way of further example, Radian has also wrongfully denied claims because either the initial claim was purportedly filed "late" or because the purportedly "missing" documentation to "perfect" the claim was filed "late." Radian makes these assertions even though Ocwen is only required to substantially comply with the Policies' proof of loss requirements, and even though Radian has not demonstrated that it has suffered prejudice as a result of any purportedly "late" claim.

57.     Radian's assertions arise from its post-hoc effort to impermissibly shield itself from exposure to valid claims.

58.     As a result of these improper denials, which are in breach of the Policies, Ocwen and the owners and trustees have suffered damage. Ocwen and the owners and trustees will continue to suffer damage on an ongoing basis as a result of these improper claim denials.

59.     Radian's claim denials for documentation and timeliness reasons are based on improper interpretations of the Policies and are inconsistent with its prior course of conduct, and thus in breach of the Policies, and are unreasonable and in bad faith.

60.     Based upon past practices, Ocwen expects that Radian will continue to deny claims based on improper and incorrect interpretations of the Policies in order to justify its wrongful and bad faith conduct.

### 2.     Radian's Improper Rescissions

61.     Radian's rescissions are largely based on its bad faith post-loss underwriting – *i.e.*, attempting to avoid the very obligations it willingly undertook now that the risks it voluntarily underwrote became manifest. Despite Radian's experience in the mortgage business, its transparent access to lenders' and servicers' mortgage business information, and its review

and re-review of substantial documentation related to the loans, Radian now contends that it can

rescind coverage based on a post-hoc re-underwriting of the loans it agreed to insure.

62.     Radian wrongfully and in breach of its Policies has invented a variety of reasons

to justify its wrongful conduct, such as:  (1) alleged misrepresentation of the borrower's income;

(2) alleged misrepresentation of the borrower's employment; (3) alleged misrepresentation of the

borrower's assets; (4) alleged misrepresentation based on purportedly undisclosed borrower

liabilities/debts; (5) alleged misrepresentation concerning occupancy; (6) alleged

misrepresentation of the subject property's value; and (7) alleged underwriting guideline

violations.

63.     The Policies authorize Radian to rescind coverage in very limited situations.

64.     Condition Five(D) of the Flow Policies, for example, provides that Radian is not

liable for:

> Any Loss for which a Claim is made in connection with a Certificate of Insurance
> issued in reliance upon an Application for Insurance containing any material
> misstatement, misrepresentation or omission, whether intentional or otherwise or
> as a result of any act of fraud; provided, however, that unless the Insured had
> knowledge of or participated in a Third-Party Misrepresentation or Fraud at the
> time it was made, the Company shall not rescind or deny coverage, or adjust any
> Claim based on such Third-Party Misrepresentation or Fraud.

Ex. A, Flow Policy at 10.

65.     "Application for Insurance" is defined in the Flow Policies as "all documents,

materials, statements and exhibits, whether or not prepared by the Insured, submitted to the

Company by or on behalf of the Insured for the purpose of obtaining a Commitment of Insurance

or a Certificate of Insurance." Ex. A, Flow Policy at 4.

66.     "Third-Party Misrepresentation or Fraud" is defined in the Flow Policies as "a

misrepresentation or fraud by anyone other than the Insured, its employees or agents.  For

purposes of this definition, the Insured's agents shall include any mortgage broker and/or

intermediary originating the Loan, or anyone under contract with such persons in connection with the origination of the Loan, such as an appraiser or escrow agent." Ex. A, Flow Policy at 6.

67.     By the terms of the Flow Policies, Radian may only rescind where it has issued a certificate in reliance on the correctness of information submitted to it in the Application for Insurance. The Flow Policies do not state that Radian always relies on the information contained in the Application in making its decision to provide insurance for a particular loan, and Radian does not rely on information outside the Application. Thus, information in the Application not relied on by Radian (such as unverified borrower information on a stated income or other reduced documentation loan) or information outside of what is supplied to Radian on the Application for Insurance is not relied on by Radian and cannot form the basis for a rescission. To the extent any information is relied upon by Radian, it is not permitted to rescind coverage for a loan based on a misrepresentation by a third party (*e.g.*, a borrower) unless it can prove through credible and reliable evidence that the Servicer, or the original Insured, "had knowledge of or participated in [that] Third-Party Misrepresentation or Fraud at the time it was made." The alleged misrepresentation also must be material.

68.     Certain other Policies authorize Radian to rescind only where "there has been an intentional and material misstatement, misrepresentation or omission or as a result of any other act of fraud." Under these Policies, Radian is required to prove any alleged misstatement, misrepresentation, omission, or any other act of fraud was intentional and material.

69.     Radian has sought improperly to avoid these obligations through its incorrect interpretation of the Policies.

(a)     **Improper Rescissions Based on Alleged Misrepresentations of Borrower-Related Information**

70.     Radian claims to have learned from various sources that information provided by or on behalf of the borrower to the lender allegedly was misrepresented. Such purported

information concerns, in various cases, the borrower's income, employment, assets, debts and/or liabilities, and occupancy. Based on this putative information, Radian has improperly rescinded coverage for these individual loans under the Policies and these rescissions have led to repurchase demands and other claims made to Ocwen by various third-parties.

71.     Radian's rescissions are in bad faith and in breach of contract in that Radian unjustifiably bases its determinations on the collection of information that Radian agreed was not required to be obtained by the originator during the loan underwriting process.

72.     Radian's treatment of stated income loans is just one example of its bad faith conduct. On a stated income loan, the loan originator was not required to independently verify the borrower's income information under the programs and guidelines that had been approved by Radian. If Radian did not wish to insure loans where the borrower's income was not supported with documentation, then it did not have to insure such loans. Its decision to accept these types of loans for coverage precludes Radian from re-underwriting them after default, based on subsequently-acquired information that was either not required at origination or, in some cases, did not even exist at the time of origination. Because Radian reviewed and approved lender guidelines, it was fully aware that for a stated income loan the borrower's income would not be verified by obtaining documentation to support the borrower's income and, therefore, that these loans involved increased risk. In fact, Radian charged a higher premium rate for stated income loans because of the increased risk that borrowers would misrepresent their incomes. Radian now cannot rescind coverage based on the very risks it agreed to insure for which it accepted increased premiums.

73.     The information provided by Radian to support its rescissions with respect to all loan types based on alleged misrepresentation of income, employment, assets, undisclosed liabilities/debts and occupancy, among others, is untrustworthy, unsubstantiated, and does not

satisfy the standard of proof that Radian must put forth to establish that there were material misrepresentations entitling it to avoid coverage.

74.    As a result of Radian's improper rescissions based on purportedly misrepresented borrower information, Ocwen has suffered and will continue to suffer damage.

(b)    **Improper Rescissions Based on Alleged
Misrepresentation of Property Value**

75.    The information provided by Radian to support its rescissions based on misrepresentation of the value of the subject property is equally meritless.  Radian generally relies on a review or retrospective appraisal that merely disagrees with the original appraiser's opinion as to the value of the property at the time the loan was originated.

76.    As an initial matter, because Radian reviewed and approved guidelines that did not require review appraisals (before such loans were even originated), Radian cannot now rely on such information to rescind coverage.  Relying on review or retrospective appraisals to rescind coverage is another example of Radian's bad faith post-loss underwriting.

77.    Furthermore, since a statement as to the value of a property is an opinion, in order to avoid coverage under the Policies for an individual loan based on a misrepresented statement of value, applicable law requires that Radian establish that the value opinion set forth by the appraiser was not the appraiser's actual opinion or, at least, that the appraiser's opinion was not rendered in good faith.  It is not sufficient simply to show that a second appraiser has a different opinion, particularly where the second appraiser's opinion was developed with the benefit of hindsight.  Radian also must show that the alleged misrepresentation of value was material.

78.    As a result of Radian's improper rescissions based on purportedly misrepresented property values, in breach of its Policies, Ocwen, and the owners are trustees, have suffered and will continue to suffer damage.

(c)    **Improper Rescissions Based on Alleged Guideline**

**Violations**

79.     In additions to rescissions based on purported misrepresentations, Radian also improperly attempts to rescind coverage based on purported underwriting guideline violations.

80.     Radian's Flow Policies do not authorize Radian to rescind coverage based on alleged guideline violations.  Once a loan is underwritten, and a certificate of insurance is issued, coverage is bound and Radian may only rescind based on certain limited grounds explicitly set forth in the Flow Policies.

81.     Even if certain Pool Policies authorize Radian to rescind based on guideline violations, the guideline violation must be material and must be based on information available to the underwriter at the time of origination.  Radian cannot rely on information outside of the loan file and not available to or required to be obtained by the underwriter at origination to rescind based on an alleged guideline violation.  Radian also cannot purposefully mislabel a borrower misrepresentation a guideline violation to circumvent the plain language in its Flow Policies, for example, that places the risk of borrower misrepresentation on Radian.

82.     Furthermore, a discrepancy between a loan's characteristics and the applicable underwriting guidelines does not necessarily mean that there has been a material breach of guidelines.  Radian knew and understood that underwriters had the discretion to grant exceptions to guidelines based on compensating factors.  Therefore, Radian cannot now second guess the underwriter's decision at origination, with the benefit of hindsight.  Radian must consider compensating factors when assessing whether there has been a material breach of guidelines.

83.     As a result of Radian's improper rescissions based on alleged guideline violations, in breach of the Policies, Ocwen and the owners and trustees have suffered damage and will continue to suffer damage.

### 3.   Radian's Improper Curtailments of Covered Claims

84.     In addition to rescinding coverage and denying claims improperly, Radian has also improperly deducted amounts from claims that Radian agrees are covered under its Policies. These deductions purport to account for alleged delays in foreclosure and other ways in which the servicer of the loan supposedly failed to properly service and/or mitigate losses. Radian's efforts to curtail covered claim payments are improper and a further manifestation of its attempt to limit its exposure to covered claims post hoc.

85.     Radian's Policies provide little guidance to Servicers concerning the commencement and completion of foreclosure proceedings and loss mitigation activities. And because Radian never cites to any policy provisions in its correspondence curtailing claims, it is unclear to Ocwen from where that authority derives.

86.     Certain Policies provide that:

> The Insured shall commence and diligently pursue Appropriate Proceedings, but in no event later than six (6) months after it is permitted to do so pursuant to the terms of the Loan and applicable law. . . .

Ex. A, Flow Policy at 11.

87.     "Appropriate Proceedings" typically is defined as:

> any action or proceeding which vests in the Insured all of the Borrower's rights and title in and to the Property including, but not limited to, foreclosure by public or private sale or voluntary conveyance from the Borrower; provided, however, that such action or proceeding shall not be inconsistent with the requirements of Conditions Six, Nine and Fifteen of this Policy and is permitted by applicable law.

Ex. A, Flow Policy at 3.

88.     Ocwen is not required to commence Appropriate Proceedings before the Loan becomes six (6) months in Default. The Policies do not define what it means to "diligently pursue" Appropriate Proceedings. And the Policies do not specify any timeframe by when Ocwen must complete Appropriate Proceedings.

- 23 -

89.     There are no express provisions in the Policies that authorize Radian to curtail claims for purported delays made by Ocwen in commencing, pursuing or completing Appropriate Proceedings.

90.     The only provision that is potentially applicable to Radian's curtailments is the Negligence exclusion, which provides:

> Any Loss arising out of any negligence of the Insured or Servicer in the origination or servicing of a Loan which negligence is either the proximate cause of such Loss or materially increases the risk insured, provided that if the Company can reasonably determine the amount by which such negligence increased the Loss as calculated in Condition Eleven (B), its remedy shall be to adjust the Loss accordingly.

Ex. A, Flow Policy at 10.

91.     Thus, by the express terms in those Policies that contain exclusions for "negligence," Radian cannot curtail a claim unless it proves that Ocwen was in fact negligent in the servicing of a loan, that such negligence was "either the proximate cause of such Loss or materially increase[d] the risk insured," and that Ocwen's negligence increased the Loss.

92.     Like the Appropriate Proceedings provision, the Mitigation of Damages provision in certain Radian Policies similarly provides little guidance to Servicers.  That provision, in pertinent part, provides:

> The Insured shall actively cooperate with the Company to prevent and mitigate Loss including, without limitation, the collection of rents, the assertion of its rights in and to any collateral or security in its custody or control, assertion of rights against the Borrower, and prompt reporting to the Company of any preforeclosure sale offers.  If a preforeclosure sale is approved by the Company and the Insured, but for any reason the sale does not close, then the Company shall continue to administer the Policy as if no sale had been attempted. The Company may assist the Insured in efforts to mitigate any Loss.

Ex. A, Flow Policy at 14.

93.     The Mitigation of Damages provision further stresses that Radian "shall actively cooperate with the Insured to administer the Policy in such a way as to not increase the Insured's uninsured loss, pursuant to the reciprocity and mutuality of the parties' obligations."  Therefore,

if Radian receives regular reporting on the subject loans, Radian has an obligation to tell Ocwen

if and when Radian believes Ocwen's servicing is or soon could be increasing any Loss.

94.     Certain Policies further provide that:

> Every Loan insured under this Policy shall be serviced in a reasonable and prudent manner and consistent with the highest standards of servicing in use in the residential mortgage industry.  Such servicing shall include, but not be limited to, diligent efforts to cure a Default, including Borrower contact, and prompt reporting of any Default to the appropriate credit reporting bureau(s). . . .

Ex. A, Flow Policy at 12.  But none of Radian's Policies define what it means to be of the

"highest standards of servicing in use in the residential mortgage industry."

95.     In an improper attempt to fill in the gaps created by its Policies and to justify its

excessive and inappropriate curtailment rate, Radian unilaterally introduced its Guide, which was

*never* incorporated into the Policies and does *not* bind Ocwen.  Radian's post-hoc servicing

standards Guide fails to properly account for servicing delays imposed by applicable law and

industry standards designed to protect distressed homeowners, and conflicts with relevant

provisions in its Policies.  In addition, Radian's self-imposed servicing standards guide changes

from time to time at Radian's whim, and does not properly account for delays beyond a

servicer's control such as a borrower's change in financial circumstances requiring re-review of

eligibility for workout programs, gaps and/or delays in borrower documentation, court delays,

borrower litigation, or title issues that could result in extended default servicing and/or

foreclosure timelines.

96.     Upon information and belief, Radian also relies on its own internal guidelines that

it either is unwilling to share with Ocwen or were never documented and thus are completely

subjective and arbitrary depending on the Radian analyst reviewing any given loan, and which

present a moving target for Servicers, including Ocwen.

97.     Radian's refusal to pay the full claim amount owed has nothing to do with

Ocwen's loan servicing practices and everything to do with Radian's efforts to preserve capital.

98.     As a result of Radian's wrongful curtailment of claims, in breach of the Policies, Ocwen and the owners and trustees  have suffered damage and will continue to suffer damage.

## COUNT I
## BREACH OF CONTRACT

99.     Ocwen incorporates by reference the allegations contained in all of the foregoing paragraphs.

100.     Radian has received all premiums due under the Policies and has received timely submitted claims for losses due to default by borrowers in the repayment of loans.

101.     Ocwen has substantially complied with all terms, provisions and conditions of the Policies.

102.     Radian agreed under the terms and conditions of the Policies to cover losses due to defaults by borrowers in the repayment of loans.  Radian has a contractual obligation to pay covered losses.  Radian has a further obligation to pay covered claims in full and not arbitrarily deduct amounts from covered claim payments without justification.

103.     After presentation of satisfactory evidence of loss to Radian for loans, claims and proofs of loss that substantially complied with all the terms, provisions and conditions of the Policies, Radian committed substantial and material breaches of its contractual obligations under the Policies by:

(a)     failing to pay claims within the time periods required under the Policies;

(b)     refusing to pay claims within the time periods required under the Policies;

(c)     wrongfully denying claims under the Policies;

(d)     wrongfully rescinding coverage under the Policies; and

(e)     wrongfully curtailing claim payments under the Policies.

104.     In addition, implied in every insurance policy is a covenant that the insurance

company will act in good faith and deal fairly with its insured, that the insurance company will do nothing to interfere with the right to receive benefits under the policy, that the insurance company will give at least as much consideration to the interests of the insured as it does its own interests, that the insurance company will exercise diligence, good faith, and fidelity in safeguarding the insured's interests, that it will deal ethically with the insured, and will fairly and adequately inform the insured with respect to the nature and scope of its insurance coverage (hereinafter referred to as the "implied covenant of good faith and fair dealing").

105.    Radian, in violation of the implied covenant of good faith and fair dealing, has refused to acknowledge the coverage provided under the Policies by refusing to pay valid claims for reasons that are unsubstantiated under the terms and conditions of the Policies.  Radian has done so for the purpose of consciously withholding policy benefits and placing its own interests above those of its insured's for the purpose of utilizing money which should have been paid under the terms and conditions of the Policies.

106.    As a direct and proximate result of Radian's contractual breaches of the Policies and of the implied duty of good faith and fair dealing, Ocwen, on behalf of the owners and trustees, is authorized to collect substantial monetary damages in an amount to be determined at trial, including compensatory damages in the amount of unpaid insurance claims, consequential damages, interest, and other such relief the Court deems just and proper.

## COUNT II
### DECLARATORY JUDGMENT

107.    Ocwen incorporates by reference the allegations contained in all of the foregoing paragraphs.

108.    Radian has received all premiums due under the Policies and has received timely submitted claims for losses due to default by borrowers in the repayment of loans.

109.    Ocwen has substantially complied with all terms, provisions and conditions of the Policies.

110.    Ocwen seeks declaratory relief as to how the Policies should be interpreted and applied with regard to issues raised by Radian, including denials, rescissions and/or curtailments for matters unrelated to the credit quality of the underlying loan or the validity of a claim, such as alleged missing documentation in the loan file.

111.    Radian has rescinded coverage and denied claims based on an improper construction of the Policies' terms and conditions.  Thousands of loans are covered under the Policies.  In addition to claims that have been reported, claims are being submitted on a regular basis to Radian.  It is expected that Radian will seek in the future to deny and/or rescind coverage with respect to these loans on the same improper grounds for denial and/or rescission that Radian has already asserted.  It also is expected in the future that Radian will seek to arbitrarily deduct amounts from covered claim payments without justification on the same improper grounds Radian already has asserted to support other improper curtailments.

112.    Based on its conduct to date, it is clear that Radian disputes the proper construction of the Policies with regard to the handling and processing of claims.  It also is clear that Radian's curtailment of covered claims is at odds with Ocwen's position, as Ocwen believes that Radian is required to pay the full amount of submitted claims, without Radian's improper deductions or curtailments.  Accordingly, it is necessary and proper for the Court to declare the rights and obligations of the Parties under the Policies, as more specifically set forth in the Prayer for Relief, in order to guide the Parties both with regard to claims that currently are pending but also as to claims that continue to be made on a regular basis and certainly will be made in the future.

## COUNT III
## BAD FAITH

113.    Ocwen incorporates by reference the allegations contained in all of the foregoing paragraphs.

114.    As alleged above, Radian agreed under the terms and conditions of the Policies to provide insurance for losses due to defaults by borrowers in the repayments of loans.  Radian received timely submitted valid claims under the Policies.  Radian has refused to pay these claims even after recognizing that the claims are valid and that Ocwen is entitled to payment.

115.    Radian knew and understood that if it wrongfully rescinded, denied and/or curtailed claims that third parties would seek to have Ocwen repurchase these loans and that Ocwen would be required to expend substantial sums in addressing these repurchase requests.

116.    Radian's conduct as described above and set forth below constitutes bad faith, prohibited by 42 Pa. Cons. Stat. § 8371.

117.    Moreover, Radian has repeatedly violated and continues to violate the Pennsylvania Unfair Insurance Practices Act, 40 P.S. § 1171.1 *et seq*.  While there is no private cause of action for such violations, and no such private cause of action is asserted here, those violations are evidence of Radian's bad faith.

118.    An insurance company has a duty to act with the utmost good faith towards its policyholders.

119.    As discussed in detail above, Radian, in tortious violation of Pennsylvania's bad faith statute, has refused to acknowledge the coverage it provided under the Policies by wrongfully rescinding coverage and by refusing to pay and/or curtailing the payment of valid claims for reasons that are unsubstantiated under the terms and conditions of the Policies.

Radian has done so in order to consciously withhold policy benefits and place its own interests above those of its insured.

120.    Radian's persistent and systematic actions and failures to act were done purposefully, intentionally, and/or with reckless disregard of its obligations under the Policies. Radian's actions and inactions have been with willful and conscious disregard of Ocwen's rights and the consequences of these actions on Ocwen, and with the deliberate intent to vex, injure, and advance Radian's own pecuniary interest.

121.    Radian has acted in bad faith by refusing to fully pay valid claims submitted for coverage for such losses, and its conduct has been aggravating and outrageous, in that Radian has, among other things:

    (a)    failed to deal fairly with Ocwen and failing to give equal consideration in all matters to Ocwen's and/or other Insureds' interests;

    (b)    engaged in unreasonable, frivolous, or untenable denial of policy benefits;

    (c)    misrepresented pertinent facts or policy provisions relating to coverages at issue;

    (d)    asserted inconsistent positions regarding the meaning of its policy provisions and adopting the coverage-limiting interpretation as the correct one;

    (e)    compelled Ocwen to institute, continue, or submit to action to recover amounts due under the Policies;

    (f)    failed to provide a reasonable explanation of the basis for its various insurance coverage positions;

    (g)    refused to investigate claims in a fair, neutral, objective, and unbiased manner;

    (h)    engaged in conduct designed to find facts to support a rescission, denial, and curtailment, and ignoring facts that support coverage in full;

    (i)    failed to promptly settle certain claims, where liability has become reasonably clear in order to influence settlements as to other claims where liability may be reasonably contested;

(j)   denied claims based on perceived claim perfection defects that are unreasonable and not required by the Policies;

(k)   rescinded coverage based on information that was not required to be obtained at origination;

(l)   imposed time limitations for completing foreclosures or other servicing activities that are unreasonable, in violation of federal or state law, and/or not specified in the Policies; and

(m)  consciously curtailed claim payments for reasons that are unfounded in a misguided attempt to limit Radian's exposure to the claims at issue.

122.   As a result of Radian's bad faith conduct, Ocwen and the owners and trustees have suffered and will continue to suffer substantial monetary damages, including interest and attorneys' fees and costs.  In addition to monetary damages, Ocwen is entitled to an award of punitive or exemplary damages in such amount as is sufficient to punish Radian for its willful and tortious actions, pursuant to 42 Pa. Cons. Stat.  § 8371.

## COUNT IV
## EQUITABLE INDEMNIFICATION

123.   Ocwen incorporates by reference the allegations contained in all of the foregoing paragraphs.

124.   Under the Policies, Radian is obligated to pay mortgage insurance claims for the benefit of certain third party owners of insured loans serviced by Ocwen, including GSEs such as Fannie Mae and Freddie Mac.

125.   As a result of Radian's wrongful rescissions, denials and/or curtailment of claims, Ocwen has been forced to compensate certain of these third party owners for the claim amount Radian failed to pay in full.

126.   Based on the doctrine of equitable indemnification, Ocwen seeks indemnification from Radian for any such amounts Ocwen was forced to pay to these loan owners in

compensation for Radian's failure to fulfil its contractual obligations to pay claims and/or pay claims in full.

## PRAYER FOR RELIEF

WHEREFORE, Ocwen respectfully seeks the following relief:

1.       With respect to the First Cause of Action, Ocwen requests that the Court enter judgment against Radian for actual money damages in an amount to be proven at trial, including compensatory damages in the amount of unpaid insurance claims, consequential damages, interest, and other such relief the Court deems just and proper.

2.       With respect to the Second Cause of Action, Ocwen requests that the Court declare the rights and obligations of the Parties, including but not limited to, a declaration that:

a.   The doctrine of substantial compliance applies with respect to compliance with the submission of claims and perfected claims under the Policies;

b.   The doctrine of substantial compliance applies with respect to any time-limitation provisions under the Policies;

c.   Radian is required to prove that is has been materially prejudiced by a delay in the submission of a claim or perfected claim before it can deny the claim as "late";

d.   Radian cannot deny a claim based on Ocwen's purported failure to provide "missing" documentation from the loan origination file if Radian does not demonstrate that:  it has suffered prejudice; such documentation was material to the underwriter's credit decision at the time of origination; and the information within such documentation was not otherwise available;

e.   Radian cannot deny a claim based on Ocwen's failure to provide "missing" documentation from the servicing file;

f.   Radian is required to return the total premium paid on loans where it denies the claim;

g.   Even if Radian has a valid "missing" documentation defense, Radian's remedy is a curtailment of the claim amount and not a complete denial of the claim;

h.   Radian bears the risk of borrower misrepresentation under its Flow Policies;

i.  Under all of its Policies, Radian cannot rescind unless it proves through credible and admissible evidence that there was an intentional first party misrepresentation and that such misrepresentation was material;

j.  Radian cannot rescind based on an alleged misrepresentation of information that was not required to be obtained by the underwriter at origination under the applicable guidelines approved by Radian and thus not contained within the loan origination file;

k.  Radian may not rely on retrospective or review appraisals to rescind based on an alleged misrepresentation of the value of the subject property;

l.  Even if Radian is authorized to rely on respective or review appraisals to rescind based on an alleged misrepresentation of the value of the subject property, Radian must provide through credible and admissible evidence that the opinion stated was not the appraiser's actual opinion or, at least, that the appraiser's opinion was made in bad faith;

m.  Radian is not authorized to rescind coverage under its Flow Policies based on an alleged guideline violation;

n.  Even if certain Pool Policies authorize Radian to rescind based on guideline violations, the guideline violation must be material and must be based on information required to be obtained by the underwriter at the time of origination;

o.  Radian cannot rescind based on borrower misrepresentation through the guise of a guideline violation;

p.  Radian must consider compensating factors when assessing whether there has been a material breach of underwriting guidelines;

q.  Radian must cite to the relevant provision(s) in its Policies upon which it relies to curtail claims;

r.  Radian cannot curtail a claim unless it proves that Ocwen was negligent, that such negligence was either the proximate cause of such loss or materially increased the risk insured, and that Ocwen's negligence increased the Loss;

s.  The rights and responsibilities of the Parties are governed by the Policies and not any servicing guide or claims manual, including Radian's Guide, that have not been incorporated into and/or endorsed to the Policies;

t.  Radian cannot impose a time limitation for beginning, pursuing or completing Appropriate Proceedings or loss mitigation that is not specified in the Policies and/or violates state or federal law;

u.  Any applicable statute of limitations, policy provisions limiting the time in which an action may be commenced, or other defenses to the commencement of a proceeding based on the passage of time begins to run on the date Radian denies,

rescinds or curtails the claim or, if applicable, the date Radian declines to overturn its denial, rescissions or curtailment after Ocwen appeals such a determination; and

v.  If any policy provision limiting the time in which an action may be commenced conflicts with the laws of the jurisdiction in which the subject Property is located, the laws of the jurisdiction in which the subject Property is located must be applied.

3.  With respect to the Third Cause of Action, Ocwen requests that the Court enter judgment against Radian for attorneys' fees and costs, punitive damages, interest and all damages and other available relief recoverable by law.

4.  With respect to the Fourth Cause of Action, Ocwen requests that the Court enter judgment against Radian for equitable indemnification of any sums Ocwen was forced to pay certain loan owners in compensation for Radian's nonpayment or curtailment of claim payments owed to such third party owners.

DATED:  December 22, 2016          BY:

Matthew D. Rosso (PA 203696)
Whitney D. Ross (PA 206956)
REED SMITH LLP
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA  19103
mrosso@reedsmith.com
wross@reedsmith.com

David M. Halbreich (*pro hac vice* application to be submitted)
Reed Smith LLP
355 South Grand Avenue
Suite 2900
Los Angeles, CA 90071
dhalbreich@reedsmith.com

David E. Weiss (*pro hac vice* application to be submitted)
REED SMITH LLP
101 Second Street
Suite 1800
San Francisco, CA  94105

dweiss@reedsmith.com

*Counsel for Plaintiffs*